UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
NEW SEA CREST HEALTHCARE CENTER,
LLC, and SHORE VIEW NURSING HOME   **MEMORANDUM & ORDER**

                 Plaintiffs,   12 CV 6414 (RJD) (RLM)

      - against -

LEXINGTON INSURANCE COMPANY

                 Defendant.
----------------------------------------------------------------x
DEARIE, District Judge

      This case arises out of insurance claims that plaintiffs New Sea Crest Healthcare Center and Shore View Nursing Home submitted to defendant Lexington Insurance Company for losses they sustained during Hurricane Sandy. Shore View's policy provided coverage for one nursing home in Brooklyn, and Sea Crest's policy provided coverage for two locations: a nursing home in Brooklyn, and an administrative office in Great Neck that was not damaged. Sea Crest's nursing home is located in a Special Flood Hazard Area ("SFHA"), which is an area of one hundred-year flooding as defined by the Federal Emergency Management Agency. The policies limit flood coverage to $1 million per year and do not cover properties located in an SFHA for flood damage. Much of the damage plaintiffs incurred resulted from "storm surge"—a wind-driven inundation of water, which Lexington deemed flood damage. As a result, Lexington denied New Sea Crest coverage and only paid Shore View $1 million, citing the flood sublimit.

      To resolve this dispute, we are asked to decide whether damage caused by "storm surge" is damage caused by "flood" and therefore subject to the flood sublimit under plaintiffs' policies. Although the policies' definition of flood explicitly includes the term storm surge, plaintiffs argue that they are separate perils because the policies list flood and storm surge separately in

another provision—the "named storm" sublimit. As such, plaintiffs argue that Lexington improperly denied them coverage and assert claims for breach of contract, breach of the covenant of good faith and fair dealing, and negligent misrepresentation. Lexington seeks summary judgment. The Court finds that a storm surge is a type of flood under the policies and grants the motion.

## BACKGROUND

Viewed in the light most favorable to plaintiffs, the record reveals the following facts, which are undisputed except as otherwise noted.

### A. The Policies

Plaintiffs' insurance policies are "all risk,"[1] but contain various sublimits of liability that restrict the coverage for certain types of damage. The two relevant sublimits are for "flood" and "named storm." The flood sublimit limits an insured's coverage for flood damage to $1 million a year for properties outside an SFHA and does not provide flood coverage for properties inside an SFHA. See Wilson Decl. Ex. 2, at SC 906. The named storm provision limits an insured's coverage for damage resulting from a named storm, such as Hurricane Sandy, to $36,650,000 per year. The policies state that the named storm sublimit applies "Regardless of the number of Coverages, **Locations** or Perils involved including, but not limited to, all **Flood**, (however caused) wind, wind gusts, storm surges, tornados, cyclones, hail, or rain." Id. at 906–07. However, it also provides that any damage by flood during a named storm is still limited to the flood sublimit. That is, insureds can only recover up to $1 million (or are not covered if their

---

[1] An "all risk" insurance policy provides coverage for all causes of property loss that are not otherwise excluded.

2

property is in an SFHA) for flood damage even if they incur that damage in the context of a named storm. The policies define "flood" as:

> [W]hether natural or manmade, **Flood** waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike, or other surface containment structure, storm surge, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not. A tsunami shall not be considered a **Flood**.

Id. at SC 929.

## B. Lexington's Denial of Coverage Beyond the Flood Sublimit

After Hurricane Sandy, plaintiffs met with their insurance broker and consultant Mr. Scott Primiano to discuss their coverage for the property damage. Mr. Primiano told plaintiffs that Lexington would cover them to the full extent of the policies and instructed them to hire vendors to begin repairs. Plaintiffs did so on October 31, 2012. On November 13, Mr. F. Kevin Foster, Lexington's outside independent adjuster, investigated the damage. He also told plaintiffs that Lexington would cover the damage up to the policies' full limits.[2] Pls.' 56.1 Statement ¶ 26.

However, on November 16, Lexington sent a Reservation of Rights letter to each plaintiff, stating that its preliminary investigation showed they sustained losses due to flood. The letters directed plaintiffs' attention to the flood sublimit in the policies and asked them to forward any information that would alter Lexington's coverage position. Wilson Decl. Exs. 21, 22. On November 27 and 30, Lexington sent plaintiffs additional letters stating that their coverage would be limited to the flood sublimit, which was $1 million for Shore View and $0 for Sea Crest given its location in an SFHA. However, the letters also stated that Lexington would

---

[2] For purposes of summary judgment, Lexington concedes that Mr. Foster made this representation.

3

review any "detailed submission" regarding loss or damage plaintiffs believed was not subject to the flood sublimit.[3] Id. Exs. 23, 24.

Plaintiffs did not send any further submissions. Instead, they instituted the instant action, asserting that Lexington could not limit their coverage to the flood sublimit. Their main argument is that the policy is ambiguous as to whether a storm surge is a type of flood, so they are entitled to coverage up to the named storm sublimit. Lexington seeks summary judgment.

## DISCUSSION

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must show that there is no issue of material fact, and the Court must "view the evidence in the light most favorable to" the non-moving party in determining whether the moving party has met this burden. Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 124 (2d Cir. 2013). However, the non-moving party must tender evidence demonstrating a genuine issue for trial, Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir. 2006), and must offer more than "conclusory allegations or unsubstantiated speculation" to defeat summary judgment, DeFabio v. E. Hampton Union Free Sch. Dist., 623 F.3d 71, 81 (2d Cir. 2010) (quoting Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)).

### A. Breach of Contract

In resolving a dispute over insurance coverage, the court first looks to the policy language. See Morgan Stanley Grp. Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000). Under New York Law, the initial interpretation of a policy is a question of law, and the court must give effect to a policy's unambiguous language. See id. A policy is ambiguous if it "could

---

[3] Plaintiffs do not dispute that Lexington sent these letters, but assert that they applied for coverage for all damage to their property, not just flood damage. Pls.' 56.1 Statement ¶¶ 29–31.

suggest more than one meaning when viewed objectively by a reasonably intelligent person." Id. (internal quotation marks omitted). In a coverage dispute, any ambiguity regarding an exclusion of coverage is resolved in favor of the insured. Belt Painting Corp. v. TIG Ins. Co., 100 N.Y.2d 377, 383 (2003).

Plaintiffs concede that that the flood sublimit trumps the named storm sublimit for damage caused by flood. However, they argue that the policies' language is ambiguous as to whether a storm surge is a type of flood or a separate peril because storm surge and flood are listed separately in the named storm sublimit. They further assert that they can recover for their losses under additional provisions in the policies and that Lexington should have covered them for pure wind and sand losses, which are not subject to the flood sublimit.

The policies are unambiguous that a storm surge is a type of flood. The policies warn insurers on the first page that bold terms have technical definitions.[4] Although the named storm sublimit lists flood and storm surge separately,[5] because flood is in bold the insurer is alerted that the term has a technical definition that applies in the named storm context. That definition expressly includes the term "storm surge" as a type of flood and further states that a flood includes water driven by wind. A "'storm surge' is little more than a synonym for a 'tidal wave' or wind-driven flood." Bilbe v. Belsom, 530 F.3d 314, 317 (5th Cir. 2008). Thus, the policy definition makes it doubly clear that a storm surge is a type of flood under the policy—it contains that precise word and describes the physical characteristics of a storm surge.

---

[4] The policies state that, "[t]erms which appear in boldface type have special meaning. See Section VIII POLICY DEFINITIONS." Wilson Decl. Ex. 2, at SC 906. The term flood appears in boldface type.

[5] Notably, "wind" and "wind gusts" are listed separately in the named storm sublimit. These are undoubtedly two variations of the same peril, which undermines plaintiffs' argument that "storm surge" and "flood" being listed separately shows the two are separate perils.

Moreover, whether a storm surge is a separate peril from a flood was hotly contested in the wake of Hurricane Katrina, and the Fifth Circuit "repeatedly held that the term 'flood' includes storm surges" in the ordinary meaning of the words. Id. at 316; see Leonard v. Nationwide Mut. Ins. Co., 499 F.3d 419, 436–38 (5th Cir. 2007). Although these cases were decided in the context of water-damage exclusions in homeowner insurance policies, the policy definitions of water-damage at issue are similar to Lexington's definition of flood in that they include wind-driven water. If anything, Lexington's definition is clearer that a storm surge is a type of flood than the policies in Leonard and Bilbe because it includes the very term in its definition. The fact that Lexington's policies also list storm surge and flood separately in the named storm sublimit—a provision that limits coverage—does not make the policies ambiguous as to whether a storm surge is a type of flood.

The policies are also unambiguous that all loss or damage due to a flood is subject to the flood sublimit. As such, plaintiffs cannot recover beyond the flood sublimit for storm surge losses under the policies' additional provisions, which include debris removal, civil or military authority, demolition, ingress/egress, ordinary payroll, equipment breakdown, and service interruption. The policies provide that the "Sublimits of Liabilities are . . . per **Occurrence** unless otherwise indicated." Wilson Decl. Ex. 2, at 906. The named storm provision also states that "the maximum amount [Lexington] will pay per **Occurrence** for all such loss or damage by **Flood** shall be the Sublimits of Liability for **Flood**." Id. at SC 907. Because the policies define an occurrence to "include[] all resultant or concomitant insured losses," id. at SC 930, they make clear that all losses that stem from a flood, including those enumerated above, are subject to the flood sublimit. Cf. Victory Container Corp. v. Sphere Ins. Co., 448 F. Supp. 1043, 1045 (S.D.N.Y. 1978) (Tenney, J.) (flood limit listed under "Property Limits" heading did not apply to

6

business interruption losses because business interruption is not a property loss, but "a provision denominated 'Flood Limit'" would apply to "all types of loss caused by flood"). Therefore, plaintiffs cannot recover beyond the flood sublimit for losses they incurred due to storm surge under the policies' additional provisions. Lexington did not breach the insurance policy by limiting Shore View's flood coverage to $1 million and denying New Sea Crest flood coverage given its location in a SFHA.

With respect to plaintiffs' losses due to wind and sand, Lexington does not dispute that plaintiffs may be entitled to recover beyond the flood sublimit for pure non-flood losses. See Defs.' 56.1 Resp. Statement ¶¶ 9, 11. As Lexington points out, however, these potential losses are not at issue in this litigation because plaintiffs were only denied coverage for flood loss beyond the flood sublimit. Lexington's letters to plaintiffs denying coverage specifically stated that, "[t]o the extent the insured sustained loss or damage by Named Storm that is not by flood, or you believe is covered under any other policy provision, Lexington will review any detailed submission made on behalf of your client." Wilson Decl. Ex 24. After plaintiffs received these letters, their attorney wrote: "We are awaiting the numbers and analysis from Brawerman so that we can get the promised letter [i.e., detailed submission] out." Id. Ex. 34. However, plaintiffs never sent a submission. Moreover, at oral argument Lexington's counsel conceded that it "would be on the hook for any wind damage" and that "if [plaintiffs] can come forward with evidence of pure wind damage, it's not too late [for them to recover]." Oral Arg. Tr. 26:21–22, 27:13–16. Because there is no evidence in the record that Lexington "denied or declined to follow up on" any non-flood loss claims, there is not a dispute that is ripe for adjudication with respect to them. See King's Gym Complex, Inc. v. Phila. Indem. Ins. Co., 314 F. App'x 342, 344 (2d Cir. 2008).

7

## B. Duty of Good Faith and Fair Dealing

An implied duty of good faith and fair dealing exists in every insurance contract, such that "'a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims.'" Jane St. Holding, LLC v. Aspen Am. Ins. Co., No. 13-CV-2291, 2014 WL 28600, at *10 (S.D.N.Y. Jan. 2, 2014) (Sweet, J.) (quoting Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York, 10 N.Y.3d 187, 194 (2008)). However, New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Dufficy v. Nationwide Mut. Fire Ins. Co., No. 13-CV-6010, 2013 WL 6248529, at *2 (E.D.N.Y. Dec. 2, 2013) (Feuerstein, J.) (internal quotation marks omitted). In addition, "bad faith cannot be found where the insurance carrier has an arguable case for denying coverage." Jane St. Holding, LLC, 2014 WL 28600, at *11 (internal quotation marks omitted).

Plaintiffs allege that Lexington breached the covenant of good faith and fair dealing by denying them coverage and that Mr. Foster's representations that they would be covered to the full extent of the policy evidences bad faith. Sea Crest also asserts bad faith because it paid an $18,325 premium for flood insurance but was denied coverage given its location in a SFHA.[6]

Because Lexington did not breach the policies by limiting plaintiffs' coverage for storm surge damage to the flood sublimit, plaintiffs do not have a cause of action for breach of the covenant of good faith and fair dealing. Moreover, the policy does not provide coverage for

---

[6] Sea Crest paid a $79,939 premium for its policy, and plaintiffs tendered evidence indicating that $18,325 of this premium was for flood coverage. Shore View paid a $70,000 premium for its policy, and plaintiffs tendered evidence indicating that $8,125 of this premium was for flood coverage. Lexington disputes that the premiums were broken down by peril. See Defs.' Resp. 56.1 Statement ¶¶ 4–5.

properties in SFHAs that are damaged by flood. Therefore, Lexington did not breach the covenant of good faith and fair dealing by denying Sea Crest coverage for its storm surge losses.

## C.     Negligent Misrepresentation

Under New York law, negligent misrepresentation requires that, "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000). Plaintiffs argue that Mr. Foster negligently misrepresented that Lexington would cover the full extent of their losses under the policies' named storm sublimit and that they reasonably relied on his statements in continuing their cleanup efforts.

Even if plaintiffs had a special relationship with Mr. Foster, the record demonstrates that they did not reasonably rely on his statements. Plaintiffs began their cleanup efforts on October 31, and Mr. Foster did not represent that Lexington would cover the damage until November 13. Moreover, Lexington sent plaintiffs Reservation of Rights letters, directing their attention to the flood sublimit, three days later. Plaintiffs then received additional letters that Lexington was limiting coverage to the flood sublimit. The initial Reservations of Rights letters put plaintiffs on notice that the flood sublimit might apply to their claims, so any reliance on Mr. Foster's statements would have been unreasonable at that point. See Hoffend & Sons, Inc. v. Rose & Kiernan, Inc., 19 A.D.3d 1056, 1058 (4th Dep't 2005).

## CONCLUSION

For the foregoing reasons, the court grants defendant's summary judgment motion on claims for breach of contract, breach of good faith and fair dealing, and negligent misrepresentation.

SO ORDERED.

Dated:     Brooklyn, New York

           June 24, 2014

                                         /s/ Judge Raymond J. Dearie

                                         RAYMOND J. DEARIE
                                         United States District Judge